

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-2000

# United States v. Hammer

Precedential or Non-Precedential:

Docket 98-9011

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Hammer" (2000). *2000 Decisions.* Paper 185.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/185

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 31, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-9011

UNITED STATES OF AMERICA

v.

DAVID PAUL HAMMER,

        Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 96-00239)
District Judge: Honorable Malcolm Muir

Argued July 18, 2000

BEFORE: BECKER, Chief Judge, and STAPLETON and
GREENBERG, Circuit Judges

(Filed: August 31, 2000)

        David M. Barasch
        United States Attorney
        Frederick E. Martin
        Assistant United States Attorney
        240 West Third Street
        Suite 316
        Williamsport, PA 17701

Gwynn X. Kinsey, Jr. (argued)
Attorney, United States Department
of Justice
Criminal Division
601 D. Street, N.W.
Washington, D.C. 20530

 Attorneys for Appellee

David Paul Hammer (argued)
P.O. Box 33
Terre Haute, IN 47808-0033

 Appellant pro se

Ronald C. Travis
Rieders, Travis, Mussina,
Humphrey & Harris
161 West Third Street
P.O. Box 215
Williamsport, PA 17703

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, N.J. 07042

 Stand-by Attorneys for Appellant

John J. Gibbons
Lawrence S. Lustberg (argued)
Jessica A. Roth
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione
One Riverfront Plaza
Newark, N.J. 07102-5497

 Attorneys for amicus curiae
John J. Gibbons

2

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I.

A.

This matter comes before this court on David Paul Hammer's appeal from the judgment of conviction and sentence entered on November 4, 1998, in which the district court imposed a sentence of death. We will dismiss the appeal.

On April 13, 1996, Hammer, then an inmate at USP/Allenwood in Pennsylvania, murdered Andrew Marti, another inmate, by strangulation within a cell in the special housing unit in Allenwood. Hammer was a state prisoner transferred to the federal system from Oklahoma pursuant to 18 U.S.C. S 5003 and Marti was a federal prisoner serving a sentence for bank robbery. No question ever has been raised about the fact that Hammer committed the murder.

A grand jury indicted Hammer for violations of 18 U.S.C. S 1111 (first degree murder within the special maritime and territorial jurisdiction of the United States) and 18 U.S.C. S 1118 (murder by a federal prisoner serving a life sentence). The court, however, on the government's motion, dismissed the section 1118 charge and thus Hammer ultimately went to trial solely on the section 1111 charge. Prior to the trial, the government served and filed a notice that it intended to seek the death penalty. While originally Hammer presented an insanity defense, during the trial he pleaded guilty to the murder, thus abandoning that defense.

Thereafter the case was tried to the jury but only with respect to the sentence. On July 24, 1998, the jury returned a verdict recommending the imposition of the death sentence. Subsequently, Hammer filed a pro se

motion seeking an order discharging counsel and allowing him to proceed pro se and determine for himself whether to appeal. The district court held an evidentiary hearing on the motion. It received testimony from two highly qualified psychiatrists, Drs. John Mitchell and James Wolfson, who had examined Hammer. Their testimony is chronicled in the district court's opinion, United States v. Hammer, 25 F. Supp. 2d 518 (M.D. Pa. 1998). See especially the findings of fact 21-38, id. at 523-24.

In the testimony cited in these findings, the psychiatrists canvassed the range of cognitive and emotional capacities relevant to the question whether Hammer was competent to waive his rights and whether his waiver was voluntary. They concluded that Hammer was fully competent, and that his decision to forego an appeal and ask for the immediate imposition and carrying out of the sentence of death was a competent and well reasoned decision. The district court also noted that the parties stipulated that none of the defense experts who testified at trial suggested that Hammer was incompetent at any relevant time. 1 On the basis of the foregoing, the district court found that Hammer was competent to waive his rights and that the waiver was voluntary.

On October 9, 1998, the court entered an order discharging Hammer's counsel, appointing stand-by counsel for him, and fixing a sentencing date. On November 4, 1998, the district court sentenced Hammer to die. A notice of appeal was filed on Hammer's behalf on November 12, 1998.

In the course of its opinion the court described the case as follows:

> The evidence presented during the trial viewed in a light most favorable to the government establishes that Mr. Hammer bound each limb of Mr. Marti by using the ruse that he would only slightly injure Mr. Marti and obtain a transfer for Mr. Marti to another prison. Mr. Hammer after rendering Mr. Marti helpless put Mr.

_____

1. The district court also received extensive testimony from Hammer, strikingly similar to the statements he made to us, detailed infra.

4

Marti in a sleeper hold. Testimony from a pathologist established that Mr. Marti struggled in the restraints. Once Mr. Marti was rendered unconscious by the sleeper hold, Mr. Hammer strangled him with a homemade cord. In recommending a sentence of death the jury, as required by statute, found that the government established beyond a reasonable doubt that Mr. Hammer intentionally killed Mr. Marti. The jury also found beyond a reasonable doubt the following two statutory aggravating factors: (1) Mr. Hammer previously had been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year and (2) Mr. Hammer committed the murder of Mr. Marti after substantial planning and premeditation. These two statutory aggravating factors are supported by the record.

Id. at 520 (footnotes omitted).

On November 27, 1998, Hammer filed a pro se motion to dismiss the appeal but on December 18, 1998, hefiled an application to withdraw that motion which we granted on December 30, 1998. On March 23, 1999, Hammer again filed a motion to dismiss the appeal and by order of April 16, 1999, we reserved decision on the motion. Then on July 23, 1999, stand-by counsel on behalf of Hammer filed a motion to withdraw the motion to dismiss the appeal. On August 3, 1999, we granted the motion to withdraw the motion to dismiss the appeal and thus the case proceeded to the briefing stage.

B.

After opening briefing, Hammer on May 8, 2000,filed a pro se motion for immediate dismissal of his appeal. By our order dated May 11, 2000, we reserved decision on the motion. Subsequently, Hammer sought reconsideration of our May 11 order and unsuccessfully sought en banc consideration of his motion to dismiss. Thereafter, we entered an order reciting that we had examined the extensive record in the case and satisfied ourselves that there was no question of competency.2 We indicated,

_____

2. We relied essentially on the record of proceedings in the district court.
We also note however, that we received (from Hammer) records of

5

however, that we were concerned with the question of whether the Federal Death Penalty Statute, 18 U.S.C. SS 3591-98, permits an appeal to be waived. Accordingly, we appointed John J. Gibbons, Esq. as amicus curiae"to brief the question whether an appeal under the Federal Death Penalty statute may be waived by a competent defendant." We fixed a briefing schedule and directed the government to file a responsive brief to the amicus's brief. Moreover, we set argument for July 18, 2000, and directed the clerk of our court to determine if it would be possible for Hammer to appear at the argument from his place of confinement at USP/Terre Haute through video-conferencing. We provided that if video-conferencing was possible we would hear Hammer personally. Both the amicus and the government have filed briefs as we directed, the amicus contending that a waiver is not permissible, or at least, that one may not withdraw an appeal oncefiled, and the government contending the opposite.

On June 30, 2000, Hammer filed a motion requesting that we deem that he had withdrawn his May 8, 2000, motion to dismiss the appeal or that we dismiss the motion to dismiss the appeal. In view of this motion we considered that the issue of whether the appeal could be dismissed probably was moot as we do not doubt that up until the argument date on July 18, 2000, we would have allowed Hammer to withdraw his motion to dismiss his appeal and thus would have heard the appeal on the merits. Then, in the final significant pre-argument development we received a letter dated July 11, 2000, on July 13, 2000, from Hammer that once again stated that he wanted the appeal dismissed. In the letter, after setting forth certain background information, Hammer recited the following:

> Therefore, I urge this court to decide my Pro se Motion
> to have my appeal dismissed and not to consider the

_____

subsequent regular psychiatric evaluations made by the medical staff at Lewisburg, which essentially established the existence of a continuum, in which Hammer's mental state was unchanged. We solicited the advice of all counsel (including stand-by counsel) but no one suggested that there was any question about Hammer's competency.

6

issue moot. My only desire is to have the sentence of death implemented expeditiously, and whatever process or procedure that achieves this result fastest is what I feel is best.

C.

The oral argument was held on July 18, 2000, as scheduled. Hammer was present by video-conferencing and he argued at length. The members of this panel, his stand-by counsel, government counsel, and counsel for the amicus curiae all were able to see and hear Hammer quite clearly. He spoke with great intelligence, logic, and force, addressed the legal issues with considerable skill, demonstrated a total command of the record, and was calm and in total control of himself. Furthermore, he spoke respectfully toward the court, his attorneys, and the amicus curiae. He demonstrated his command of the case by making very little use of notes.

At the outset Hammer said that it had always been his intent "to be executed as promptly as possible."[3] Thus, he complained about the delay in the proceedings, although he later acknowledged that he was in part responsible for the delay. He said that he wanted his appeal dismissed so he could be executed. Hammer represented that he never authorized the filing of the notice of appeal. As he described it, a notice of appeal was prepared by counsel on a "stand-by" basis, and filed without his consent, although he admitted that he subsequently acquiesced in it. He said that "the death penalty . . . is the law of the land." Moreover, he indicated that if anyone had been aggrieved by constitutional violations in his case it had been he but that he was willing to waive any violations and that no one else had standing to complain.

Hammer stated that he had accepted responsibility for

_____

3. Hammer later qualified this statement explaining that he had on occasion changed his mind when he received a letter from the mother of another death row inmate stating that, if he died, her son might too. However, Hammer always reverted to his original intent to waive an appeal and have the sentence of death carried out.

7

killing another human being, that there was no question but that he had killed Andrew Marti, and that he had a fair though not a perfect trial. He said the jury returned the verdict and that society had spoken through the 12 members of the jury. He asked, how would society be protected if this appeal went forward? He then asked, how was the interest of justice being served by the appeal? He rejected the amicus's position that an appeal was mandatory. He indicated that if he had a choice to live he would do so but that he was not living, he merely was "existing" in a small confined area, with only brief time out for showers and exercise. He pointed out that he was 41 years old and had been in prison for 22 years since he was a teenager except when he was on "escape status," and faced 1,000 plus years in jail. He said that he would die in prison, and preferred the certainty of knowing when and how he would die, describing lethal injection as simple and painless. He stated that he had read stand-by counsel's brief and in his view, the chance of winning on appeal is slim.[4]

Hammer said that it was in his best interest to have the "sentence of death implemented as expeditiously as possible." He asked that, if we granted his motion to dismiss, we send the case back to the district court with instructions to schedule the execution. He said that if we leave the matter in the hands of the Justice Department or the Attorney General the case could linger and then "the President might get involved."

He also said that he wanted to point out that his case was different than the cases of most people on death row because, in his words, he was the "politically correct execution candidate." He then explained his reasons for that conclusion which were that he is a "white man," the murder was inside a prison, he already was serving a huge amount of time, and his victim was white. Hammer also commented upon the current controversy over the death penalty, noting that he did not meet any of the criteria that the Justice Department was studying regarding the fairness

_____

4. Hammer even discussed the legal basis for the appeal and commented that almost all of the asserted grounds had been rejected by the jurisprudence, much of it by this court.

8

of its imposition, since there was no question of his guilt, reiterating that he had killed Andrew Marti. Moreover, he indicated that he had "absolutely no intention of seeking clemency from the President of the United States. I don't want to appeal. Obviously, I don't want clemency."

Hammer then said he would only be free when he was dead, and he flatly denied that he was committing suicide. Rather, he said that he accepted the judgment of the court and the jury and that he accepted "responsibility for my actions, for my actions of killing Andrew Marti." Indeed he made an extraordinary plea for the imposition of the death penalty. He pointed out that it had been four years since he had murdered Marti. He said that if capital punishment is ever going to mean anything then it should be implemented in a time frame when people remember why it is being imposed. He argued that until the death penalty is changed "it should be implemented expeditiously."

He then discussed the "cruel and unusual punishment" aspect of a capital case. He said that it was not cruel and unusual for him to take a few steps, lie down on a gurney, be strapped in and have drugs inserted into his veins. He said the act of dying is the easy part and that the cruel and unusual element of capital punishment is the mental and emotional torture and everything you put yourself through while you are waiting.

Near the end of his statement he once again demonstrated that he accepted responsibility for his acts by saying that the only way he could make amends was to accept the punishment. The panel, of course, was mindful that Hammer had vacillated with respect to the prosecution of the appeal and thus at the end of Hammer's statement we asked him:

> Are you saying to us that if we dismiss this appeal you're not going to come back to us and ask us to hear your appeal later?

Hammer responded:

> Yes, sir.

II.

A.

We deal initially with a point that the government raised in its brief filed on July 13, 2000, in which it argued that even though a defendant sentenced to die need not appeal, we should hold that "Hammer has irrevocably elected to proceed with the appeal." Br. at 6. The government took this position which, if accepted, would have resulted in our hearing the appeal on the merits, because it was concerned that if we dismissed the appeal Hammer later would contend that we should hear it. The government, however, prepared its brief after Hammer filed his June 30, 2000 motion which sought an order leading us to hear his appeal but before he filed his July 11, 2000 letter requesting us to dismiss the appeal. The government cited St. Pierre v. Cowan, ___ F.3d ___, 2000 WL 862521 (7th Cir. June 28, 2000), and Smith v. Armontrout, 865 F.2d 1502 (8th Cir. 1988), as support for its argument.

In considering the government's request, from which we note that in the light of Hammer's personal plea it somewhat retreated at oral argument, we treat Hammer's motion as a motion to dismiss under Fed. R. App. P. 42(b) which, as germane here, provides that "[a]n appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court." We are satisfied that we have discretion to grant, or to deny Hammer's motion as the government requested that we do in its brief. See Clarendon Ltd. v. Nu-West Indus., Inc., 936 F.2d 127, 128– 30 (3d Cir. 1991); HCA Health Servs. of Virginia v. Metropolitan Life Ins. Co., 957 F.2d 120, 123 (4th Cir. 1992). We also note that Hammer's July 11, 2000 letter and his statements to this court on July 18, 2000, have changed the situation since the government made the request to us to hear the appeal on the merits. Hammer has without equivocation asked us to dismiss his appeal and has indicated that he will not change his mind with respect to his request. We are satisfied that the concerns the government has expressed about Hammer changing his mind do not require us to hear Hammer's appeal. Thus, we

will consider Hammer's motion to dismiss and will not hold that he has elected irrevocably to proceed with the appeal.

B.

Our determination with respect to the general exercise of discretion takes us to the issue on which we sought briefing: does the Federal Death Penalty statute preclude a defendant sentenced to death from waiving his right of appeal? We think that resolution of this issue bears upon the exercise of our discretion. The appeal provision of the statute, 18 U.S.C. S 3595 ("section 3595"), provides as follows (emphasis added):

> (a) Appeal.--In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant . Notice of appeal must be filed within the time specified for the filing of a notice of appeal. An appeal under this section may be consolidated with an appeal of the judgment of conviction and shall have priority over all other cases.

> (b) Review.--The court of appeals shall review the entire record in the case, including--

> (1) the evidence submitted during the trial;

> (2) the information submitted during the sentencing hearing;

> (3) the procedures employed in the sentencing hearing; and

> (4) the special findings returned under [18 U.S.C. S] 3593(d).

> (c) Decision and disposition.--

> (1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under [18 U.S.C. S] 3592.

11

(2) Whenever the court of appeals finds that --

 (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

 (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

 (C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure,

the court shall remand the case for reconsideration under [18 U.S.C. S] 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

(3) The court of appeals shall state in writing the reasons for its disposition of an appeal of a sentence of death under this section.

It is, of course, immediately evident that section 3595 authorizes but does not explicitly require an appeal by a defendant sentenced to death. The absence of such a requirement would seem to establish clearly that a defendant is not required to appeal a sentence of death. After all, in general, parties to federal litigation, whether civil or criminal, need not appeal adverse verdicts. Thus, if Congress had intended to reverse this usual practice surely it would have said so. Moreover, in Whitmore v. Arkansas, 495 U.S. 149, 166, 173, 110 S.Ct. 1717, 1729, 1733 (1990), Justice Marshall in his dissenting opinion indicated that "[s]ociety's overwhelming interest in preventing wrongful executions is evidenced by the fact that almost all of the 37 States with the death penalty apparently have prescribed mandatory, nonwaivable appellate review of at least the sentence in capital cases." The Supreme Court decided Whitmore in 1990, yet when Congress enacted

12

section 3595 in 1994 (see Pub. L. 103-322, Title VI, S 60002(a), 108 Stat. 1967), it did not in terms require mandatory review of a death sentence although Justice Marshall's dissent spelled out the state practices.

Amicus seeks to overcome the absence of a requirement for an appeal in section 3595 by a strained reading of the section. Section 3595(a) provides initially that"[i]n a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal." The first quoted sentence plainly establishes as a prerequisite to the exercise of appellate jurisdiction that the defendant appeal. While it is true that the next sentence provides that "[n]otice of appeal must be filed" within the specified time, that provision is a limitation on when a defendant may appeal rather than an affirmative command to him to do so and even the able amicus curiae does not contend otherwise in his brief. After all, if Congress had intended that there be a mandatory review of death penalty proceedings it had no need to provide that this sentence was "subject to review . . . upon appeal of the defendant." Instead, it simply could have provided for automatic review, as do many (but not all) states.

Amicus seeks to overcome the plain import of section 3595 by pointing out that section 3595(b) provides that the "court of appeals shall review the entire record in the case" and that section 3595(c)(1) provides that the court of appeals "shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under [18 U.S.C. S] 3592." Amicus notes that the Act charges the Court with making these determinations even if the death-sentenced prisoner has not raised them. These provisions, however, are not an independent source of appellate jurisdiction. Clearly, they do nothing more than specify the scope of review when an appeal is filed. Along the same lines, section 3595(c)(2),

13

which provides that upon making certain findings the court of appeals shall remand the matter to the district court, becomes operative only when appellate jurisdiction is invoked in the first instance.

For all the foregoing reasons we conclude that we have discretion to either grant or deny Hammer's motion to dismiss his appeal and that there is no reason attributable to the text of the Federal Death Penalty Act to exercise our discretion under Rule 42(b) to deny Hammer's motion to dismiss the appeal.5

We have considered in this regard amicus's argument that to avoid a conflict with the Eighth Amendment the Federal Death Penalty Act "precludes a capital defendant from waiving direct appellate review of his death sentence." Br. at 4. For a number of reasons the Eighth Amendment argument is unavailing. The death penalty is not inherently a punishment that violates the Eighth Amendment. See Gregg v. Georgia, 428 U.S. 153, 176–87, 96 S. Ct. 2909, 2926–32 (1976). While the Supreme Court has discussed the importance of making appellate review available to defendants, see, e.g., Parker v. Dugger, 498 U.S. 308, 32, 111 S.Ct. 731, 739 (1991) (discussing the "crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"), it never has suggested that this right cannot be waived. Cf. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871 (1984). In Harris, the Court upheld the California death penalty statute which had no provision for proportionality review. It noted that several, but not all, of state death penalty statutes provided for (1) proportionality review; and (2) an automatic appeal. It concluded that the former was not constitutionally necessary, and made no comment about the latter. See id. at 44–45, 104 S.Ct. at 876. Furthermore, the Court never has allowed that society at large has a constitutionally cognizable interest in appellate review of capital sentences. See Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, (rejecting third party attempt to raise appeal on defendant's behalf); Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436 (1976) (same).

_____

5. Indeed, it would seem strange for the Act to require Hammer to pursue an appeal that it did not oblige him to file.

14

C.

In concluding our opinion we thank the amicus curiae and the members of his firm for ably advancing the positions that an appeal is mandatory under the Federal Death Penalty statute when the death penalty is imposed and that we should not dismiss this appeal. Nevertheless, as the foregoing discussion makes clear, Hammer is a confessed murderer who not only pleaded guilty but also obtained what he believes was a fair trial on the penalty phase of the case. Moreover, it does not appear that any other person has a legally-cognizable interest in these proceedings. At all events, we have carefully considered the entire record and concluded that, in the circumstances, the interests of justice do not require that he be compelled to appeal or that we review the district court proceedings on the merits. We have considered the options, but are satisfied that the proper course is to exercise our discretion to grant Hammer's motion to dismiss. The appeal will be dismissed. The case will be remanded to the district court to fix an early new date for the implementation of the sentence of death.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

15